UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

IN RE SPECIALTYCHEM PRODUCTS CORP.,

    Debtor.

Bankruptcy Case No. 06-23131

---

M&M HOLDINGS, LLC,

    Appellant,

**Case No. 07-C-56**

  v.

UNSECURED CREDITORS COMMITTEE et al.,

    Appellees.

---

### DECISION AND ORDER

---

M&M Holdings, LLC, ("M&M") appeals an order of the United States Bankruptcy Court for the Eastern District of Wisconsin, which denied its application for payment of an administrative claim of $250,000. M&M claims it was due the fee for services rendered in the sale of certain assets of the debtor, SpecialtyChem Products Corporation ("SPC"). For the following reasons, the order of the bankruptcy court will be affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

SPC voluntarily filed a petition for Chapter 11 bankruptcy on June 12, 2006. In attempting to sell its assets located in Marinette, Wisconsin, SPC negotiated with several prospective purchasers prior to the auction date. SPC's primary secured lender, Wachovia Bank ("Wachovia"),

as well as SPC's creditors, pressured SPC to proceed to auction with what is known as a stalking horse bidder. (Tr. of 10/25/06 Hr'g [Dkt. #3, Part 2] at 9-10.) In the bankruptcy context, a stalking horse bidder reaches an agreement with the debtor-in-possession to purchase assets prior to the court-supervised auction of those assets. Because this bid will be exposed to higher and better bids at auction, the agreement typically provides for a break-up fee to compensate the stalking horse bidder for setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement. Here, for example, due diligence involved not only assessing the health and prospects of the debtor's business, but also determining the amount of environmental exposure the buyer would assume in light of past chemical spills at the Marinette facility. (*See* Tr. of 10/25/06 Hr'g [Dkt. #3, Part 3] at 60-61.)

On September 15, 2006, SPC filed a motion requesting authority to sell the Marinette assets and requesting approval of bidding procedures and purchase forms (the "sale motion"). (Dkt. #1, Parts 2-6.) In the sale motion, SPC represented to the bankruptcy court that a successful reorganization was not possible and that its assets needed to be sold on an expedited basis. (*Id.* ¶¶ 14, 15, 22.) SPC also requested permission to select an entity as a stalking horse bidder and to offer that entity a break-up fee subject to such limitations as the bankruptcy court established. (*Id.* ¶ 24.) The sale motion also set forth certain limitations on payment of a break-up fee; among these were (1) that SPC's determination to use an entity as a stalking horse bidder would be made after consultation with secured lender Wachovia and secured creditor Cambridge Chemicals, Inc. ("Cambridge"); and (2) that payment of a break-up fee was conditioned on the stalking horse bidder's execution of an asset purchase agreement with SPC. (*Id.*)

A hearing on the sale motion began on September 27, 2006, and then adjourned to September 29, 2006. One important issue considered on both days of the hearing was the need for consultation with lenders and creditors regarding selection of a stalking horse bidder. (Tr. of 9/28/06 Hr'g [Dkt. #7 Part 9] at 180-81; Tr. of 9/29/06 Hr'g [Dkt. #1, Part #34] at 30-33.) Timothy Nixon, SPC's lead counsel in the bankruptcy, later testified that prior to and during the September 29 hearing, SPC was negotiating with two potential stalking horse bidders, Resilient Capital Group (a/k/a SpecialtyChem Acquisition Corporation) ("Acquisition") and M&M. (Tr. of 10/25/06 Hr'g [Dkt. #3, Part 2] at 13-15.) Nixon also testified that during the September 29 hearing, he consulted with the unsecured creditors' committee and the secured lenders regarding the status of SPC's negotiations with both Acquisition and M&M, and that neither group objected to M&M as the stalking horse bidder. (*Id.* at 15, 18-19.) Attorneys for secured creditor Cambridge, however, appeared at the September 29 hearing by telephone, and claim they did not have the opportunity to participate in, or receive any information regarding, the negotiations taking place in the courtroom, nor have the opportunity to consult with their client. (*Id.* at 35-41; *see also* Appellee's Br. [Dkt. #11] at 4.)

Near the beginning of the September 29 hearing, Nixon represented to the court and other counsel that SPC was negotiating for a stalking horse bidder for the Marinette facility (Tr. of 9/29/06 Hr'g [Dkt. #1, Part 34] at 4), and it appears that rather frenzied negotiations continued throughout the hearing in the form of in-court discussions, phone calls, and text-messaging. These negotiations were directed primarily at M&M, which had raised its bid the prior day to $6.3 million. (Tr. of 10/25/06 Hr'g [Dkt. #3, Parts 2-3] at 24, 64). Nixon represented in court that M&M was going to be the stalking horse bidder (Tr. of 9/29/06 Hr'g [Dkt. #1, Part 34] at 30), and apparently

3

all that remained was some tweaking of the agreement's language. (Tr. of 10/25/06 Hr'g [Dkt. #3, Part 3] at 65.) Later in the hearing, Nixon was alerted by his office, which had been working on drafts of the purchase agreement, that SPC and M&M had come to an agreement.[1] (*Id.* [Dkt. #3, Part 2] at 15, 18.) Nixon thereupon informed the parties and the court that SPC had selected a stalking horse bidder. (*Id.* at 18; Tr. of 9/29/06 Hr'g [Dkt. #1, Part 35] at 52.) Nixon later testified that he left the hearing believing he was authorized to accept M&M's offer, having received the acquiescence of the creditor constituency and the tacit acquiescence of the bankruptcy court. (Tr. of 10/25/06 Hr'g [Dkt. #3, Part 2] at 20.)

Friday afternoon and evening were marked by various communications between respective counsel for SPC and M&M that confirmed the agreement. (*E.g., id.* at 22-23, 68-69.) Among these communications was a voice-mail Nixon left on Friday evening for one of M&M's attorneys, in which Nixon confirmed that M&M was the stalking horse bidder and stated that Acquisition, if it wished to purchase SPC, would have to do so by bidding at the auction. (Tr. of 10/25/06 Hr'g [Dkt. #3, Part 2] at 71.; *see also* Appellant's Br. at 6-7.) Also on Friday evening, SPC's president called the managing director of Facilitator Capital Fund, which had created M&M in order to purchase SPC, and congratulated him for reaching the stalking horse bidder agreement. (Tr. of 10/25/06 Hr'g [Dkt. #3, Part 2] at 103-05.) SPC e-mailed M&M an asset purchase agreement on Friday evening (and copied the agreement to counsel for the lenders and creditors), but on account of the upcoming weekend and family obligations, the parties agreed to postpone signing the agreement until Monday. (*Id.* at 22-23, 67-69.) SPC's management had further communications

---

[1] The bankruptcy court had permitted Nixon to keep his Blackberry device turned on during the motion hearing, apparently because of the potential impact of the SPC-M&M negotiations on the hearing. (Tr. of 10/25/06 Hr'g [Dkt. #3, Part 2] at 18.)

4

and meetings with representatives of M&M on Saturday, Sunday, and the morning of Monday, October 2, in order to plan future marketing strategies and address further due diligence and staffing. (*Id.* at 106-08.)

Sometime during the morning of Monday, October 2, M&M learned that over the weekend Acquisition had submitted a bid that exceeded its own by roughly $750,000 and that SPC, at the urging of its creditor constituencies, had accepted Acquisition's bid. (*Id.* at 24-25, 73-75.) No other bids were made for SPC's Marinette assets, and the bankruptcy court confirmed Acquisition's offer as the winning bid by Order of October 10, 2006. (*See* Dkt. #1, Part 10.)

M&M filed a motion to receive a break-up fee of $250,000 as an administrative expense under 11 U.S.C. § 503(b)(1)(A), which motion was considered by the bankruptcy court at a hearing held on October 25, 2006. After the hearing, the bankruptcy court asked the parties to submit briefs on the appropriate burden of proof and on Wisconsin law regarding the requirements for an executed contract of the type discussed at the hearing. The bankruptcy court eventually denied the motion, concluding (1) M&M and SPC did not execute a contract because certain specified conditions had not been met; and (2) M&M failed to show by a preponderance of the evidence that the administrative expense provided a benefit to the debtor, as required under Seventh Circuit precedent. (Order of December 8, 2006 [Dkt. #1, Part 32]; Tr. of 11/29/06 Hr'g [Dkt. #7, Part 13] at 8-17, 21-25.) M&M appeals the bankruptcy court's denial of that motion.

**ANALYSIS**

Federal district courts have jurisdiction to hear appeals of bankruptcy court orders under 28 U.S.C. § 158(a). The reviewing court accepts the bankruptcy court's factual findings unless they

5

are clearly erroneous. Fed. R. Bankr. P. 8013; *In re Excalibur Auto. Corp.*, 859 F.2d 454, 457 n.3 (7th Cir. 1988). If the bankruptcy court's factual findings are silent or ambiguous as to an outcome-determinative factual question, the district court may not engage in its own fact-finding but, instead, must remand the case to the bankruptcy court for the necessary factual determination. *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir. 1987). Legal conclusions, as well as mixed questions of law and fact, are reviewed *de novo*. *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004).

M&M argues the bankruptcy court erred as a matter of law (1) by refusing to enforce the "contract" between M&M and SPC after finding that SPC had accepted the offer and that SPC had prevented M&M from performance; and (2) by requiring M&M to show a causal relationship between its stalking horse bid and Acquisition's later bid when the "contractual" conditions for payment of the break-up fee had been fulfilled. I take up these two issues in turn.

**A. Existence of A Binding Contract**

It is important to recall the bankruptcy context here, given the fundamental difference between contracting to purchase a business in bankruptcy and contracting to purchase a business not in bankruptcy. *See In re Am. W. Airlines*, 166 B.R. 908, 911 (Bankr. D. Ariz. 1994). In a private, non-bankruptcy sale, the parties make their own decisions and are then bound by them. In a bankruptcy sale, however, there are absent third parties—that is, the creditors and equity holders—whose interests must be protected. *Siddiqui v. Gardner (In re Williamson)*, 327 B.R. 578, 581 (Bankr. E.D. Va. 2005). One way their interests are protected is by the requirement that a bankruptcy sale outside the ordinary course of business, such as debtor moved for here, be approved by the bankruptcy court. *See* 11 U.S.C. § 363(b).

6

M&M argues that under Wisconsin contract law, it had entered into an enforceable contract with SPC to be the stalking horse bidder via the asset purchase agreement. This argument fails because it ignores the larger bankruptcy context, and in particular the requirement that any asset purchase agreement reached by SPC be court-approved. M&M points to Nixon's testimony that he believed, upon leaving the hearing of September 29, 2006, that the bankruptcy court had tacitly acquiesced in the agreement between SPC and M&M. However, Nixon's subjective belief in the court's tacit acquiescence is no substitute for actual court approval. Moreover, Nixon testified he was aware of the need for court approval. (Tr. of 10/25/06 Hr'g [Dkt. #3, Part 2] at 29-30). To be fair, the transcript shows that the bankruptcy judge was eager to see SPC select a stalking horse bidder, was feeling pinched by time just as the parties were,[2] and appears to have anticipated approving the SPC-M&M purchase agreement at a later hearing. (Tr. of 9/29/06 Hr'g [Dkt. #1, Parts 34-35] at 22-23, 51-56.) Furthermore, during the September 29 motion hearing the bankruptcy judge did approve, with minor exceptions, the sale procedures regarding the Marinette assets. (*Id.* at 52-53). However, the bankruptcy judge did not approve the purchase *agreement* between SPC and M&M at that hearing or subsequently. Because of the bankruptcy context operative here and the need for court approval, SPC's and M&M's mutual understanding that they had become contractually bound did not create an enforceable contract. I therefore need not address M&M's

---

[2] Two time constraints in particular were operative here. The debtor's assets apparently kept falling in value, and during the September 29 hearing, the parties and court were attempting to finish as much business as they could before they lost the court reporter. (Tr. of 9/29/06 Hr'g [Dkt #1, Parts 34-35] at 29-30, 54.)

7

arguments that an enforceable contract existed in the narrower context of Wisconsin law (i.e., prescinding from the bankruptcy context).[3]

**B. Benefit to the Debtor's Estate**

M&M's motion to receive a break-up fee as an administrative expense was made under 11 U.S.C. § 503(b), which authorizes payment of "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). An administrative claim will be afforded priority under § 503(b) if the debt "both (1) arises from a transaction with the debtor-in-possession and (2) is beneficial to the debtor-in-possession in the operation of the business." *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) (quotations omitted). Despite the potentially broad reach of § 503(b), "administrative priority claims are to be strictly construed because the presumption in bankruptcy cases is that the debtor has limited resources that will be equally distributed to creditors." *In re Nat'l Steel Corp.*, 316 B.R. 287, 299 (Bankr. N.D. Ill. 2004). The moving party bears the burden of showing its claim is entitled to administrative expense priority, and the standard of proof is preponderance of the evidence. *Id.* (citations omitted).

Applying this standard of proof, the bankruptcy court found that M&M met the first prong of the *Jartran* test (i.e., M&M's claim arose from a transaction with SPC), but failed to meet the second. (Tr. of 11/29/06 Hr'g [Dkt. #7, Part 13] at 6, 11-12; *see also* Bankr. Ct. Order of Dec. 8,

---

[3] The bankruptcy court did address arguments regarding Wisconsin contract law but then concluded that no enforceable contract existed because the parties failed to meet certain conditions set forth in the agreement. (Tr. of 11/29/06 Hr'g [Dkt. #7, Part 13] at 6-10.) These conditions included payment of an earnest money deposit, signing of the agreement, and completion of the agreement's terms. (*Id.* at 9.) In affirming the bankruptcy court's conclusion that no enforceable contract existed, I rely on an alternative ground, namely, the undisputed fact that M&M did not obtain the required court approval of its stalking horse agreement with SPC.

2006 [Dkt. # 1, Part 32] at 3-4.) As to the second prong, the bankruptcy court noted that M&M had not introduced any evidence that Acquisition's later, higher bid was prompted by M&M's offer; rather, M&M merely urged this inference upon the bankruptcy court as the only possible explanation for Acquisition's later bid. (Tr. of 11/29/06 Hr'g [Dkt. #7, Part 13] at 11-13.)

M&M argues that the bankruptcy judge misapplied the *Jartran* test by requiring a causal relationship between M&M's stalking horse bid and Acquisition's later bid even though the "contractual" conditions for payment of the break-up fee had been fulfilled. In other words, M&M argues that in the stalking horse bidder context, formation of a stalking horse agreement is a benefit to the estate as a matter of law. (Appellants' Br. at 13.)

M&M's argument fails for at least two reasons. First, its central premise—that a legally enforceable stalking horse agreement between M&M and SPC existed here—is false, as discussed above. Moreover, the bankruptcy court's conclusion that no legally enforceable contract existed, is not contradicted or undercut by its determination that M&M's expense claim arose from a "transaction" with SPC within the meaning of *Jartran*. The bankruptcy court did not specify the content or nature of M&M's transaction with SPC, but whatever it was, the transaction was clearly *not* the formation of an enforceable stalking horse agreement. With its central premise gone, M&M's argument becomes the following: a would-be bidder's transaction with the debtor, if conducted in preparation of becoming the stalking horse bidder, benefits the estate as a matter of law. This argument, however, finds no support in case law.

The second reason M&M's argument fails is that it may not meet its burden of showing, by a preponderance of the evidence, that its claim benefitted SPC without introducing (or pointing to) at least *some* evidence of same. At the November 29, 2006 hearing, M&M introduced no evidence

9

that its own offer prompted Acquisition's later bid. Rather, M&M urged the bankruptcy court—and urges this court—to connect the dots, so to speak, and infer that its bid served as a catalyst for Acquisition's bid. According to M&M, this is the only possible inference, and as "proof" M&M notes that no party objecting to its claim to a break-up fee has offered an alternative explanation.

In response, I note first that the burden here is not on the objecting parties to present an alternative rationale for the timing and value of Acquisition's bid; the burden is on M&M to show, by a preponderance of the evidence, that its own offer benefitted the estate. The bankruptcy court correctly determined that M&M's conjecture is insufficient to meet this burden. If M&M's reasoning were followed, any party negotiating to become the stalking horse bidder would be entitled to an administrative expense claim, regardless of whether it submitted evidence of a benefit to the estate. Here, the adduced evidence shows that SPC was engaged in parallel discussions with both M&M and Acquisition. (*E.g.*, Tr. of 10/25/06 Hr'g [Dkt. #3, Part 2] at 26.) It certainly is possible, then, that Acquisition's bid was not prompted by M&M's earlier bid. In any event, the debtor has a fiduciary duty to the creditors to obtain the highest and best offer; the debtor has no duty to reward bidders merely for bidding. In selecting Acquisition's higher bid, SPC was fulfilling its duty to the creditors, and M&M admits as much. (Tr. of 10/25/06 Hr'g [Dkt. #3, Part 2] at 31.)

## CONCLUSION

Affirming the bankruptcy court in this instance might seem like a harsh result for M&M, given the efforts M&M expended and its belief that it had been selected as the stalking horse bidder. However, M&M was fully aware of the bankruptcy context within which it was operating, knew it was competing against other bidders, and—most important—knew that any purchase agreement

10

it might reach with SPC required court approval. In short, M&M knew the rules of the game, and assumed the risk that its efforts to become the stalking horse bidder might come to naught. Finally, having introduced no evidence that its offer benefitted the debtor-in-possession, M&M is not entitled to a break-up fee under *Jartran*.

**IT IS THEREFORE ORDERED** that the decision of the bankruptcy court denying M&M's application for payment of the $250,000 break-up fee as an administrative claim is **AFFIRMED**.

Dated this    20th    day of June, 2007.

      s/ William C. Griesbach
William C. Griesbach
United States District Judge